[Cite as *State v. Carusone*, 2013-Ohio-5034.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-130003 |
| | | TRIAL NO. B-0606586 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| RALPH CARUSONE, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: November 15, 2013

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Philip R. Cummings*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*William Gallagher,* for Defendant-Appellant.

Please note: we have removed this case from the accelerated calendar.

**HENDON, Presiding Judge.**

{¶1}    Defendant-appellant Ralph Carusone appeals the Hamilton County Common Pleas Court's judgment overruling his Crim.R. 33(B) motion for leave to file a motion for a new trial.  We reverse the court's judgment upon our determination that the common pleas court abused its discretion in denying leave without an evidentiary hearing.

{¶2}    Carusone was convicted in 2007 upon a jury verdict finding him guilty of felony murder in violation of R.C. 2903.02(B).  He unsuccessfully challenged his conviction in appeals to this court and to the Ohio Supreme Court.  *State v. Carusone*, 1st Dist. Hamilton No. C-070653 (Dec. 10, 2008), *appeal not accepted*, 121 Ohio St.3d 1451, 2009-Ohio-1820, 904 N.E.2d 901.

{¶3}    In 2012, he moved under Crim.R. 33(B) for leave to file a Crim.R. 33(A)(6) motion for a new trial on the ground of newly discovered evidence.  In this appeal, he advances a single assignment of error in which he contends that the common pleas court abused its discretion in denying leave without an evidentiary hearing.  We agree.

### The Trial

{¶4}    Carusone was charged with both purposeful murder and felony murder in connection with the death of Derek Rininger following a physical altercation between the two outside Rininger's home.  The jury acquitted Carusone of purposeful murder, but found him guilty of felony murder with felonious assault as the predicate offense.

{¶5}    The events preceding Rininger's death were established through the testimony of Carusone's friend and the mother of Rininger's children, Jennifer Kron;

2

Kron's roommate, Melinda Scalf; their friend Jacob Carroll; and Rininger's next-door neighbor.

{¶6} Kron and Scalf testified that, a few days before the altercation, Rininger had come to their house and had stolen $500 from Scalf. In the hours preceding the altercation, Rininger made several telephone calls to the house, during which he argued with Scalf about the money and with Carusone about being with "[his] girl," Kron. Ultimately, at Rininger's invitation, Kron, with Carusone in the passenger seat and Scalf in the backseat, drove to Rininger's house to recover what remained of Scalf's money.

{¶7} As Kron pulled into a gravel lot across from Rininger's house, Rininger ran from his house directly to the passenger side of the car and took a swing at Carusone, either through the open car window (as Scalf testified) or as Carusone got out of the car (as Kron testified). After a brief exchange of blows, Carusone returned to the car, and Rininger ran to the driver's side of the car and reached through the open window for the car keys. With Kron between them, Carusone and Rininger again struggled until Kron put the car in gear and drove away.

{¶8} Both men were bloody after their initial encounter. Neither Kron nor Scalf had seen a weapon in either man's hands. But Jacob Carroll testified that Carusone had, the night before, shown him a Smith and Wesson pocket knife with a six-inch blade that Carusone had carried on his belt. And at the hospital, a pocket knife bearing traces of Rininger's blood was recovered from the pocket of Rininger's bloody shorts.

{¶9} Rininger's "yelling" and Kron's "screaming" had attracted the attention of Rininger's next-door neighbor. The neighbor testified that she had observed two

men struggling across the front seat of Kron's car. As Kron drove off, the neighbor saw Rininger run into and through to the back of his house, return to the front steps with a towel in his hands, and "jump[] off the side of the steps."

{¶10} The neighbor "thought" that Rininger had then "run[] toward the woods." But a police officer, responding to Rininger's 911 call reporting that he had "just got stabbed," found him next to the front porch, barely conscious, with a cell phone in one hand and a blood-soaked bath towel held to his abdomen with the other hand.

{¶11} The officer summoned emergency-medical personnel. A member of that crew testified that he had observed "severe bleeding" from stab wounds to both the left inner arm and the chest, a weak pulse, and very shallow respirations, and that Rininger had not been responsive to either verbal or painful stimuli. Rininger went into cardiac arrest in the ambulance on the way to the hospital, where efforts to resuscitate him proved futile.

{¶12} Meanwhile, Kron had dropped Carusone off at a friend's house. Jacob Carroll testified that he had been present when Carusone arrived. According to Carroll, Carusone appeared "distraught, wired," but would not say why, until Carroll asked about burnt clothing that he had seen on the back patio, and Carusone replied, "I took care of business. I shanked him once."

{¶13} After leaving Carusone, Kron changed out of her blood-soaked pants, and she and Scalf tried to clean blood from the car. Rininger's neighbor had directed the police to Kron, and they were there waiting when Kron and Scalf returned home. Kron directed the police to Carusone.

{¶14} The deputy coroner's examination of Rininger disclosed stab wounds to his left inner arm and to the left side of his chest and blood in the pericardial sac that the deputy coroner attributed to a "hole into the right side of the heart." The toxicology report showed that Rininger had recently ingested alcohol, cocaine, marijuana, a tranquilizer, and an opiate analgesic.

{¶15} The defense adduced expert opinion testimony attributing Rininger's "turbulent" behavior to his recent ingestion of the alcohol and drugs. But the deputy coroner insisted that those substances had not contributed to Rininger's death. In his opinion, Rininger had instead "died as a result of a stab wound to the chest," administered with "[a] significant amount of force" to pass through the skin, the soft tissues of the chest, the cartilage of the lower rib cage, the pericardium, and then the heart.

### *The Motion*

{¶16} Carusone sought by his motion leave to file a motion for a new trial on the ground of newly discovered evidence. Crim.R. 33(A)(6) permits a trial court to grant a new trial on the ground that "new evidence material to the defense [has been] discovered, which the defendant could not with reasonable diligence have discovered and produced at trial." Crim.R. 33(B) requires that a Crim.R. 33(A)(6) motion be filed either within 120 days of the return of the verdict or within seven days after the trial court, upon "clear and convincing proof that the defendant [had been] unavoidably prevented from discovering the evidence" within the 120-day period, grants leave to file a new-trial motion out of time.

{¶17} In support of his Crim.R. 33(B) motion for leave to file a Crim.R. 33(A)(6) motion out of time, Carusone offered "newly discovered evidence" contained

in the complete report of Rininger's treatment at the hospital, the affidavit of an expert in pathology, the complete "run report" compiled by the emergency-medical personnel who had treated Rininger at the scene and on the way to the hospital, the transcript of an enhanced audio recording of Rininger's 911 call, and affidavits concerning state's witness Jacob Carroll. In support of his claim that he had been unavoidably prevented from discovering this evidence within 120 days of the verdict, Carusone offered the affidavits of his trial counsel, his mother, and the lawyer she had hired after Carusone's conviction, detailing the deficiencies in the discovery provided, the money, time and effort expended to uncover and access the newly discovered evidence, and the trial strategy that counsel would have pursued had he been provided with that evidence.

{¶18} *Hospital report.* The state had disclosed to the defense in discovery three pages of the report detailing Rininger's treatment at the hospital. The deputy coroner relied on the disclosed hospital records to arrive at his opinion that Rininger had died as a consequence of a stab wound to the heart.

{¶19} After Carusone was convicted, his mother obtained and reviewed the case file and the evidence adduced at trial, researched the medical evidence, and made public-records requests. Her review and research led her to the hospital that had treated Rininger. She there learned of the existence of, and was provided with a copy of, the complete, eight-page hospital report. The five pages of the hospital report that had not been disclosed in discovery included an x-ray report and a summary prepared by the emergency-room physician several days after Rininger's autopsy.

{¶20} Carusone's mother then engaged the services of pathology expert Thomas W. Young, M.D. Dr. Young's review of all the evidence, including the treatment outlined in the undisclosed portions of the hospital report, led him to

conclude that the deputy coroner had been mistaken in the cause of death. According to Dr. Young, nothing in Rininger's treatment at the scene, in the ambulance, or at the hospital indicated that the stab wound "at the lower end of the ribcage on the left side * * * [had] penetrated into the chest cavity or into the heart." Dr. Young found that what the deputy coroner had concluded was "a stab wound [to the heart was] in reality an injury from pericardiocentesis," that is, the insertion of a needle into the pericardial sac in an effort to resuscitate Rininger at the hospital. In Dr. Young's opinion, the evidence showed that "Rininger had died as a result of cardiac arrest brought by the combined effects of multiple drugs and alcohol and by heavy stress and exertion following a physical confrontation."

{¶21} *Evidence probative of witnesses' credibility or truthfulness.* Carusone also supported his motion with the newly discovered evidence contained in the complete emergency-medical "run report," the enhanced 911 call, and affidavits concerning Jacob Carroll. This evidence, Carusone insisted, when viewed in light of the newly discovered medical evidence contained in the complete hospital report, demonstrates that the testimony of key state's witnesses was misleading or false.

{¶22} The state had disclosed in discovery only the 8½- by 11-inch views of the two-page 8½- by 14-inch run-report form. Carusone's mother obtained the complete 8½- by 14-inch form through a public-records request, which she pursued first, and unsuccessfully, by herself and then through counsel retained in 2012.

{¶23} At trial, the state had presented the testimony of only one member of the emergency-medical crew that had treated Rininger. The crew member testified that he had observed severe bleeding from deep stab wounds to both Rininger's arm and his

chest, and that Rininger had not been responsive to painful stimuli. This testimony was contradicted by that portion of the run report that the state had disclosed in discovery, which indicated that blood had been "squirting" only from Rininger's arm wound, and that he had "flinched" in response to painful stimuli. Carusone argued in his motion that the crew member's credibility is further undermined by the newly discovered evidence contained in the portion of the run report that had not been disclosed in discovery, which lists the names and respective tasks undertaken by the crew and shows that the crew member who testified at trial had neither treated nor transported Rininger.

{¶24} Rininger's 911 call, also obtained through a public-records request, was enhanced in 2012 to filter out background noise. The enhanced recording suggests that Rininger's brother had been present when the police officer found Rininger. Carusone argued in his motion that this evidence, along with the newly discovered medical evidence, undermines the credibility of Rininger's brother, who testified at trial that he had arrived at the house after the ambulance had gone, and the credibility of the police officer, who testified that, when he found Rininger, no one else had been present who could have contaminated the crime scene.

{¶25} With respect to state's witness Jacob Carroll, Carusone's mother stated in her affidavit that she had learned in 2008 that Carroll could not remember testifying at her son's trial. After "many attempts to locate and speak to [him]," she finally located Carroll and met with him in 2010. Carroll agreed then to give an affidavit, but did not, and Carusone's mother thereafter "lost contact with [him] for a significant period of time."

{¶26} In the meantime, she obtained the affidavit of Tracy Armstrong, who had resided at the house where Carusone was dropped off after his fight with Rininger. Armstrong averred that she, and not Carroll, had admitted Carusone to the house that night, and that Carroll had not, as he testified, been at the house when Carusone arrived. She stated that Carusone had been "upset crying" and had repeatedly "[s]aid 'he kept hitting me in the head * * * he kept hitting me in the head.' " Armstrong insisted that she had made a taped statement to that effect when the police interviewed her. Her statement was not disclosed to the defense in discovery, and Armstrong was not called as a witness at Carusone's trial.

{¶27} Carroll later resurfaced, and in January 2012, he gave an affidavit. He averred that he had been a long-term substance abuser and had been on a three-day drug-and-alcohol binge on the night that Rininger died. Carroll confirmed Armstrong's statement that he had arrived at her house after Carusone. He stated that he had been aware of a fight at Rininger's house, and that he had observed that Carusone was "distraught." But Carroll did not discuss the fight with Carusone, nor did he hear Carusone say that he "took care of business" or that he "shanked" someone.

{¶28} Carroll also recanted his testimony that Carusone had shown him a Smith and Wesson knife with a six-inch blade. Carusone's mother had learned that Smith and Wesson had never made such a knife. And Carroll stated in his affidavit that while he had seen Carusone with a pocket knife, the knife did not have a six-inch blade, but instead resembled the knife that Carusone's mother had later shown him, which had a two-and-a-half-inch blade.

{¶29} Carroll further averred that he had "little memory" of talking to the police the next day and "no memory" of what he had told them, because he had still

been under the influence of drugs and alcohol. Carusone's mother stated in her affidavit that Carroll had told her that his physical condition after his hospitalization for a heroin overdose had required him to use a cane when he testified at trial, and that the police had been aware of the reason for the cane and had known that he was high when he testified. Carroll, in his affidavit, confirmed the fact of and reason for his use of the cane and his continued substance abuse. And he stated that while he remembered appearing in court, he had "little memory" of his trial testimony, because he had snorted just enough heroin that morning to keep from getting sick.

{¶30} *Trial strategy.* Finally, Carusone's trial counsel asserted in his affidavit that he would have pursued a different strategy had he been privy to the newly discovered evidence. He would have, he insisted, used that evidence to challenge the deputy coroner's autopsy findings and opinion concerning the cause of death and to challenge the credibility of Jacob Carroll. And he would not have counseled Carusone, who had been "adamant that he wanted to testify about the fight and that he did not have [a six-inch] knife," not to testify.

### *Abuse of Discretion in Denying Leave without a Hearing*

{¶31} Crim.R. 33, by its terms, contemplates a bifurcated proceeding when a motion for a new trial on the ground of newly discovered evidence is filed more than 120 after the return of the verdict. First, the court must review the motion for leave, along with any evidentiary material supporting the motion, and decide whether, under Crim.R. 33(B)'s unavoidable-prevention standard, leave to file a new-trial motion is warranted. If leave is not warranted, the matter is final, and the court may not proceed to the second step of the analysis and decide the new-trial motion. If leave is warranted, the movant is afforded seven days to file his new-trial motion,

and the court may then decide that motion on its merits. *See State v. Dawson*, 7th Dist. Mahoning No. 09 MA 209, 2011-Ohio-2773; *State v. Josso*, 8th Dist. Cuyahoga No. 77227, 2000 Ohio App. LEXIS 1859 (Apr. 27, 2000); *State v. Dawson*, 9th Dist. Summit No. 19179, 1999 Ohio App. LEXIS 3264 (July 14, 1999); *State v. Wilson*, 11th Dist. Trumbull No. 89-T-4293, 1990 Ohio App. LEXIS 5571 (Dec. 14, 1990); *State v. Stanley*, 3d Dist. Marion No. 9-88-37, 1989 Ohio App. LEXIS 3360 (Aug. 31, 1989); *State v. Lewis*, 2d Dist. Montgomery No. 10362, 1987 Ohio App. LEXIS 8742 (Sept. 18, 1987); *State v. Hunt*, 4th Dist. Scioto No. 1553, 1986 Ohio App. LEXIS 7637 (June 11, 1986); *State v. Walden*, 19 Ohio App.3d 141, 146, 483 N.E.2d 859 (10th Dist.1984); *see also State v. Dawson*, 89 Ohio St.3d 1208, 728 N.E.2d 1085 (2000) (Lundberg Stratton, J., concurring in sua sponte dismissal of a certified conflict); *State v. Davis*, 1st Dist. Hamilton No. C-860090, 1986 Ohio App. LEXIS 7725 (July 30, 1986) ("agree[ing] that the better practice consists of an initial determination of unavoidable prevention and a subsequent disposition of the motion for new trial on the merits").

{¶32} In seeking leave, the movant bears the burden of proving by clear and convincing evidence that he was unavoidably prevented from timely discovering, and from timely presenting in a new-trial motion, the evidence upon which his new-trial motion depends. *See* Crim.R. 33(B); *State v. Schiebel,* 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). A claim of unavoidable prevention must be supported with evidence demonstrating that, within 120 days of the return of the verdict, the movant did not know that the proposed ground for a new trial existed, and that he could not, "in the exercise of reasonable diligence," have learned of its existence. *Walden* at 146; *accord State v. Mathis,* 134 Ohio App.3d 77, 79, 730 N.E.2d 410 (1st Dist.1999).

A reviewing court may not overturn a decision on a motion for leave that is supported by some competent and credible evidence. *Schiebel* at 74; *Mathis* at 79.

{¶33} Crim.R. 33 does not mandate an evidentiary hearing on a motion for leave. While the decision whether to conduct an evidentiary hearing is discretionary with the court, *see Toledo v. Stuart*, 11 Ohio App.3d 292, 293, 465 N.E.2d 474 (6th Dist.1983), courts have generally held that the movant is entitled to such a hearing when he has supported his motion for leave with evidentiary material that, on its face, demonstrates unavoidable prevention. *See State v. Alexander*, 11th Dist. No. 2011-T-0120, 2012-Ohio-4468, ¶ 15; *State v. Peals*, 6th Dist. Lucas No. L-10-1035, 2010-Ohio-5893, ¶ 23; *State v. Gray*, 8th Dist. Cuyahoga No. 94282, 2010-Ohio-5842, ¶ 20; *State v. Bush*, 10th Dist. Franklin No. 08AP-627, 2009-Ohio-441, ¶ 8; *State v. Cleveland*, 9th Dist. Lorain No. 08DA009406, 2009-Ohio-397; *State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77, ¶ 7 (2d Dist.2007); *State v. Monk*, 5th Dist. No. 02CA000026, 2002-Ohio-6602, ¶ 10.

{¶34} In the proceedings below, the common pleas court denied Carusone's motion for leave following the arguments of counsel. Based on the record before us, we conclude that Carusone established, at the very least, an entitlement to an evidentiary hearing on his motion, and that the common pleas court, in failing to conduct such a hearing, abused its discretion.

{¶35} Carusone sought a new trial on the ground that newly discovered evidence demonstrated that he is actually innocent of felony murder and that he had been denied a fair trial by the state's violation of its duty to disclose that evidence in discovery. The alleged fair-trial violation also underlay his assertion, in support of

his motion for leave, that he had been unavoidably prevented from timely discovering that evidence.

{¶36} The fair-trial guarantee of the Due Process Clause of the Fourteenth Amendment to the United States Constitution imposes upon the state a duty to disclose to a criminal accused evidence material to his guilt or innocence. *See Brady v. Maryland*, 373 U.S. 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Evidence is "material" if there is a "reasonable probability" that its disclosure would have changed the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In this context, the determination of this probability entails an inquiry into not whether a trial with the undisclosed evidence would have yielded a different verdict, but whether the evidence, "considered collectively," "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 434-436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *accord State v. Ketterer*, 126 Ohio St.3d 448, 2010-Ohio-3831, 935 N.E.2d 9, ¶ 23-24*; State v. Hughbanks*, 1st Dist. No. C-010372, 2003-Ohio-187, ¶ 57.

{¶37} Carusone supported his motion for leave with evidence that the state had failed to disclose to the defense in discovery the complete hospital report and the complete emergency-medical run report. The undisclosed evidence contained in those reports, along with other newly discovered evidence, served to undermine the credibility of the state's key witnesses and provided the fundament for the pathology expert's opinion that Rininger had not died from a stab wound to the heart, but had died of "cardiac arrest brought by the combined effects of multiple drugs and alcohol and by heavy stress and exertion following a physical confrontation." Therefore, the

13

motion, on its face, demonstrated that the undisclosed evidence was material in the sense that it might reasonably be said to undermine confidence in the jury's verdict that Carusone had caused Rininger's death as the proximate result of either knowingly causing or attempting to cause him serious physical harm or knowingly causing or attempting to cause him physical harm by means of a deadly weapon. *See* R.C. 2903.02(B) and 2903.11(A).

{¶38} Carusone also supported his motion with evidence demonstrating that the state's violation of its duty to disclose material evidence had effectively precluded him from learning of the existence of that evidence and of the proposed grounds for a new trial until his mother's diligent posttrial investigation uncovered the evidence and expert analysis revealed its significance. Thus, the motion, on its face, showed that Carusone had been unavoidably prevented from timely discovering, and from timely presenting in a new-trial motion, evidence material to his actual-innocence and fair-trial claims. Therefore, Carusone demonstrated an entitlement to a hearing on the motion.

{¶39} Because Carusone was entitled to a hearing, the common pleas court's denial of leave to file a new-trial motion without a hearing cannot be said to have been based on a sound reasoning process. We, therefore, hold that the common pleas court abused its discretion in summarily overruling Carusone's Crim.R. 33(B) motion. *See State v. Hill*, 12 Ohio St.2d 88, 232 N.E.2d 394 (1967), paragraph two of the syllabus (holding that an abuse of discretion is more than an error of law or judgment, but rather implies that the court's attitude was unreasonable, arbitrary, or unconscionable); *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14 (quoting *AAAA Ents., Inc. v. River Place Community Urban*

*Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 [1990] to define an "unreasonable" decision as one that lacks a sound reasoning process).  Accordingly, we sustain the assignment of error, reverse the court's judgment, and remand this matter to the court below for further proceedings consistent with law and this opinion.

Judgment reversed and cause remanded.

CUNNINGHAM and FISCHER, JJ., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.